## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

| | |
|---|---|
| **LAURIE KELLY AND MILDRED D'ITALIA** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | **C.A. NO.** |
| ) | |
| ) | |
| ) | **COMPLAINT** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| **BAC HOME LOANS SERVICING, LP,** ) | |
| **URBAN LENDING SOLUTIONS, LLC,** ) | |
| **and FEDERAL NATIONAL** ) | |
| **MORTGAGE ASSOCIATION** ) | |
| *also known as* **FNMA** *and/or* **Fannie Mae** ) | |
| | |
| **Defendants.** | |

## I.      INTRODUCTION

1.      Plaintiffs Laurie Kelly and Mildred D'Italia ("Plaintiffs") bring this action as described in the paragraphs set forth herein.

2.      This complaint arises from the acts and/or intentional omissions of multiple Defendants, acting independently and through their subsidiaries, owners and/or predecessors in interest  as follows;

> Defendants Bank of America, N.A. & BAC Home Loans Servicing, LP (collectively referred to as "BOA when not referred to in their individual capacity"), and Urban Lending Solutions, LLC, and Federal National Mortgage Association, a.k.a. FNMA

and/or Fannie Mae, in its capacity as Trustee for an as yet identified FNMA Trust as a result of:

a.   the BOA and Urban Defendants; fraudulently hindering the mortgage loan modification process, deceptively and unfairly misleading borrowers and willful concealment of fact material to the transaction at hand, during their administration of modification review business practices, all as part of an overall fraudulent scheme to maximize mortgage servicing profitability;

b.   the BOA and FNMA Defendants; by foreclosing on Plaintiffs' property when no actual default existed to the Holder of Plaintiffs' Note.

c.   FNMA for eviction action against Plaintiffs subsequent to an alleged illegal and void foreclosure.

## II.   JURISDICTION AND VENUE

3.      This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (diversity jurisdiction) and the matter in controversy exceeds $75,000.00 exclusive of interest and costs, and because the Defendants are foreign corporations based outside of the State of Massachusetts.

4.      The parties are joined in a single lawsuit due to the significant number of common issues of fact and law raised by the claims of the Plaintiffs as detailed below.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## III.   __PARTIES__

6.      Individual and Representative Plaintiff Laurie Kelly is a citizen of Massachusetts residing at 41 Saint Margarets Street, Bourne, MA 02532 which is the subject property referenced herein.

7.      Individual and Representative Plaintiff Mildred D'Italia is a citizen of Massachusetts residing at 41 Saint Margarets Street, Bourne, MA 02532 which is the subject property referenced herein.

8.      Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

9.      Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

10.     Defendant Federal National Mortgage Association is a mortgage servicing company which upon information and belief is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.

11.     Defendant Urban Lending Solutions (formerly Urban Settlement Services, LLC) is a private company providing outsource mortgage industry related support services. Upon information and belief Urban Lending Solutions is located at 1001 Liberty Avenue Pittsburgh, PA 15222.

## IV.      FACTUAL BACKGROUND

### i.)      General Background

12.     The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; a mortgage originator makes a large number of loans. That originator pools the loans into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC) or Government Sponsored Enterprises (GSE's) Fannie Mae and/or Freddie Mac. REMICs are often named and referred to as Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely "shells" created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

13.     The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made off their books. They no longer have ownership of the mortgages and notes they pooled together and consequently become recapitalized, giving

originators the ability to lend again, in months as opposed to years. Originators also obtain the added benefit that should mortgages default and eventually fail, they have little or no exposure to the financial consequences related to defaulted mortgage loans as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

14.　　　Trusts are inherently faced with two problems from the moment of their creations. First, because they are just "shells" (they have no physical address, no communications capability, and no personnel), they have no capital to pay for the pools of mortgages, and secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts.

15.　　　The first problem is solved by the securitization of the Trust's assets. This is done by selling bonds (sometimes referred to as certificates) commonly called Residential Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big investors such as pension funds, retirement funds, etc.

16.　　　The second problem is solved by paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of mortgage servicing related matters such as collecting monthly principal and interest payments, paying taxes and insurance, etc.  Thus the necessity of keeping the Trusts as separate entities, in order for the recapitalization of mortgage originators to be accomplished through securitization, gave rise to the mortgage servicing industry.

17.　　　When a securitization of mortgages takes place many documents are created to outline the duties of the various participants of each securitization. These documents include required forms that must be filed with the SEC and those that are not. Those documents relevant to this complaint are the Prospectus and/or Prospectus Supplement, and the Pooling and Servicing Agreement.

18.　　　The Prospectus and/or Prospectus Supplement are documents, registered with the SEC, outlining the entire structure of a mortgage backed Trust's securitization. Their topics range from descriptions of the mortgages in the pool, who originated those mortgages and

under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery of the mortgages and notes to the Trust, The Certificates (bonds) offered for sale, monthly payments to the Certificate holders (bond holders), and who the servicer will be at the inception of the Trust as well as the servicer's duties, including loss mitigation practices and modification. The Prospectus and/or Prospectus Supplement is the document given to potential purchasers of the MBSs being offered for sale by the Trust in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange.

19.     In a Prospectus and/or Prospectus Supplement another document is referenced called a Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract between the Trust and the servicer and is not necessarily required to be registered with the SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

20.     As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages, and part of payment for the performance of these services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .5% = $5,000,000 servicing fee).

### ii.)     Overall Fraudulent Scheme of the BOA Defendants

21.     When the Real Estate Market suffered the nationwide collapse in 2007 the focus of the most mortgage servicers shifted to find ways to assist homeowners in danger of losing their homes.

22.     To that end, Bank of America (BOA) launched public awareness campaigns via various media to let Plaintiffs, and other borrowers of mortgage loans they serviced, know that assistance in modifying their mortgages was readily available to them.

23.     The BOA mailed scores of notices offering assistance to homeowners, posted links on their web sites offering modification assistance, easy access to information regarding modification assistance, encouraged homeowners in those notices and on those web sites, to apply for modification, that their servicer wanted to help homeowners, and some even funded outsourced outreach programs which sent counselors to homes of borrowers in attempts to directly assist them.

24.     Plaintiffs accepted and acted on these offers of assistance, by applying for modification of their mortgage loan, and relied on representations made by the customer service representatives of the Defendants, believing that their mortgage servicer was assisting them, in good faith.

25.     However, the CEOs of the Bank of America and BAC Home Loans Servicing (BAC) and their senior management teams, knew that all manner of mortgage loan modification requests could become an integral part of an overall fraudulent scheme to unfairly earn billions of dollars in illicit profits from servicing mortgage loans by exploiting Plaintiffs' and other borrowers modification requests, by using them to keep millions of mortgages in a perpetual "pending" modification application status.

26.     In this fraudulent scheme the applicant Plaintiffs and other borrowers are met with a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to purposefully stall or otherwise hinder the modification application process, as a matter of policy, approved by the CEOs of the BOA Defendants, while being used as unwitting pawns during futile attempts at modification.

27.     In facilitation of this fraudulent scheme, the CEOs and the senior management teams of the BOA and Urban Defendants approved, condoned and allowed to be executed corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to

wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, in a deliberate effort to keep their mortgage loans in a near perpetual "pending" state of application all as part of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

28.     One common method used by the BOA and Urban Defendants to accomplish their fraud was a practice commonly referred to as "Parking". Customer service representatives of BOA and Urban would intentionally delay modification reviews, borrower inquiries, and data input of documents submitted by borrowers by simply assigning those status requests, reviews of files, and assignment of tasks or functions to vacationing or terminated employees, so as to allow those borrower requests to be purposefully delayed, expire, or go unanswered.

29.     When "Parking" borrower requests, reviews, documents, and file or task assignments, customer service representatives of the Defendants would use fictitious names, employee ID numbers, and telephone extensions when identifying themselves to borrowers, and falsify internal records, so as to allow their respective firms to later deny that those borrower communications had ever taken place to borrowers and government regulators.

30.     "Parking" was extremely effective at purposefully ensuring that borrowers submissions were aged out, documents submitted by borrowers expired requiring continual re-submission, borrowers complaints would go unanswered or ignored and as a result, borrowers overall requests for modification were knowingly, willfully hindered and kept in abeyance.

31.     It was the intent of the BOA and Urban Defendants to use all manner of hindering the modification process, such as "Parking", to delay borrowers requests for modification for

as long a time as possible, so as to profit by said hindrance, from the servicing fees collected from those hindered mortgage loans, as noted herein.

32.     By using all manner of fraudulent and unfair business practices (such as "Parking") and through the concealment of information they had a duty to disclose to borrowers, the BOA and Urban Defendants purposefully hindered the modification process to keep Plaintiffs and other modification applicant borrowers in abeyance, so as to exploit pools of mortgages for maximal profitability, keeping the total amount of principal balance of the pools artificially inflated thereby maximizing the amount of the servicing fees collected from servicing of those mortgage loans.

33.     Were the BOA Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering Plaintiffs' and others attempts at modification, with no intent whatsoever of modifying those mortgages, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible.

### iii.)     Servicers Financial Incentives Against Modification

34.     There are a number of financial factors that make it far more profitable for the BOA Defendants to avoid modification, continue to keep a modification request in abeyance or distress, and to eventually push loans toward foreclosure or short sale.

35.     Stipulated in all Prospectus and/or Prospectus Supplements is a requirement that servicers must forward, from their own funds, monthly payments of principal and interest, less the servicing fees, to the Trusts on all mortgages in a given pool of mortgages, including those payments of non-performing loans and REO properties. These payments are called periodic advances or simply "advances". There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not

limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

36.     Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property of the Trust) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the BOA Defendants to actually earn interest income from their advances made.

37.     Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned foreclosure/liquidation scenario.  This is due to the practice of adding those advances to the principal balance of the loan when a modification is made, thereby spreading out the recovery of those advances by the servicer, over the life of the loan. Also, a servicer's right to recover expenses from a Trust in a loan modification, rather than a foreclosure, is less clear and less generous. Considering that the BOA Defendants are only interested in their own respective profitability (having no ownership interest in the Trust's assets), they are greatly incentivized against modification even further by these pooling and servicing agreement requirements.

38.     Moreover, by exploiting loopholes in pooling and servicing agreements, the BOA Defendants profit handsomely by routinely using the "borrower is applying for a modification" excuse to justify delaying the foreclosure of defaulted mortgages to Trusts, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest. This is done by stringing along borrowers' attempts at modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts, used primarily to allow the bill for servicing advances to pile up. Furthermore, this

reimbursement structure limits the BOA Defendants' incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

39.     Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees) in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

40.     This is all a clever, fraudulent, misleading, and deceptive balancing act employed by the BOA Defendants to maximize profits using borrowers and others as unwitting pawns when they applied for modification assistance. While BOA is making servicing advances, they appear to be losing money on the foreclosure process, yet this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary, unnecessary, and fraudulent servicing advances claimed to be paid out by BOA, plus interest.

41.     These advances are recovered by BOA as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To BOA, advances they are required to make with respect to defaulted mortgages, as stated in the pooling and servicing agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

### iv.)     Servicer Involvement in Foreclosure Process Completes their Fraud

42.     Typically, mortgage servicers are granted the power to act as nominee for a Trustee (be it FNMA, FHLMC, or the Trustee of a private-label securitized Trust), which gives them the ability to act with complete authority and control over the foreclosure and liquidation process of the mortgages they service for Trusts.

43.     Foreclosure and eviction actions are carried out, often in the name of the Servicer Defendants, acting as nominee of the Private Label Trusts, FHLMC, and/or FNMA, by the Servicer.

44.     This gives the BOA Defendants complete control over all foreclosure, eviction and liquidation actions.

45.     The ability to act as nominee of the Trustee in the above described capacity, rounds out the aforementioned fraudulent scheme perpetrated by the BOA Defendants. The BOA Defendants offer assistance and encourage borrowers to apply for modification of their mortgage loans.

46.     The BOA Defendants then use all manner of fraudulent tactics (as aforementioned) designed to hinder the modification process by keeping those borrowers modification requests in abeyance.  While those requests are kept in a perpetual "pending" state, the BOA Defendants collect servicing fees based on the principal balances of the mortgage pools they service for Trusts, which have been artificially inflated by keeping borrowers modification requests in abeyance through their fraudulent hindrance of said modification requests.

47.     The BOA Defendants, having complete control over the loss mitigation, foreclosure and liquidation processes, waits to foreclose on the defaulted mortgage loans of borrowers, until the amount of advances has reached the point whereby they can recover the maximum amount of money from liquidation proceeds based on the BOA Defendants' estimates of liquidation price.

48.     As the final act of their fraudulent scheme, once the BOA Defendants feel they have squeezed every dime they can out of a defaulted mortgage loan, they then foreclose, liquidate, and recover their money advanced, their profit from interest on those advances, and their illicit "padding" (as aforementioned) of advanced servicing expenses.

              **v.)     Urban Lending Solutions**

49.     As noted above, when the BOA Defendants began to ramp up modification assistance efforts, the CEOs of the Bank of America (BOA) Defendants and their senior management teams, recognized right away that all manner of mortgage loan modification requests could become an integral part of an overall fraudulent scheme to unfairly earn

billions of dollars in illicit servicing profits by exploiting borrowers modification requests, by using them to keep millions of modification requests and mortgage loans in abeyance.

50.      The senior management teams of BOA designed written offers of assistance, at the direction of and approval from CEO, Brian Moynihan, which were mailed to millions of borrowers nationwide. These offers of assistance encouraged Plaintiffs and millions of other borrowers to apply for modification assistance based on the representation BOA would assist borrowers in avoiding foreclosure of their homes, wanted to assist homeowners in maintaining homeownership, and would "help" Plaintiffs and other borrowers who applied for such assistance.

51.      However, BOA's true intent was to get as many borrowers to apply for modification assistance as possible and then purposefully hinder those modification requests, so as to leave them in abeyance, by design, in order to profit from the servicing of those mortgage loans.

52.      In facilitation of this fraudulent scheme, BOA restructured its corporate hierarchy after acquiring Countrywide in 2008. Acting under Bank of America CEO, Brian Moynihan, Barbara Desoer became President of Bank of America Home Loans and Insurance (HLI), which oversees the mortgage servicing operations of BOA, including its Home Retention Division (HRD). Kenneth Scheller became BOA Senior Vice President and manager of HRD. Separate from HRD, but still under BOA's servicing unit umbrella, exists the Executive Customer Relations Group (ECR).

53.      BOA's ECR Group contracted with companies, such as Urban Lending Solutions (Urban), to handle services related to BOA's modification business practices.

54.      Urban, a private company based in Pittsburgh, PA with offices in Broomfield, CO, provides a variety of outsourced services to the mortgage servicing industry.

55.      BOA (through their ECR Group) outsourced to Urban a significant amount of modification requests of BOA's customers, document submissions and eligibility determinations.

56.     Urban's work for BOA relevant to Plaintiffs' claims took place at two worksites. One of these sites, Urban's "390" Group (so named because then located at 390 InterLocken Crescent, Broomfield, CO 80021), received and scanned incoming modification financial documentation and other paperwork from Plaintiffs and other homeowners serviced by BOA, and stored those documents in what became Urban's BOA Digital Portal digital imaging repository.

57.     BOA, through Urban, solicited and directed homeowners to return documents, via FedEx, to this "390 Group" Urban location, which received hundreds of thousands of FedEx packages from homeowners seeking modification assistance from BOA.

58.     Urban hired scores of employees at their "390 Group" to accept and scan millions of pages of original documents, including Plaintiffs' and other homeowners' financials, which were saved on Urban's BOA Portal.

59.     This Document Portal, operated by Urban, at BOA's direction, became a virtual "black hole" for Plaintiffs' and other homeowners' documents, when requesting modification assistance. BOA, BAC, and Urban's executives concealed the existence of Urban's BOA Document Portal from their employees assisting homeowners with modification requests so as to allow them to falsely deny having received documents homeowners had sent to BOA and BAC, at Urban's "390 Group" location.

60.     Another Urban Broomfield location (11802 Ridge Parkway) housed Urban's Outsourced Services unit, offering comprehensive vendor services custom-tailored for clients such as BOA. This location was responsible for handling escalated homeowner complaints regarding modification requests.

61.     BOA committed to making Urban a Tier 1 vendor in exchange for working with BOA to meet its goals to fraudulently and purposefully keep Plaintiffs and millions of other homeowners requests for modification assistance in abeyance, so as to allow BOA to maximize servicing related income from the servicing of those mortgage loans. Said Tier 1

vendor status offered Urban the prospect of hundreds of millions of dollars in revenue in the years ahead.

62.    Urban employees were given BOA titles within BOA's Office of the CEO and President. Plaintiffs and other homeowners were instructed to contact BOA through telephone numbers which went directly to Urban's Broomfield location. To the Plaintiffs and other homeowners seeking assistance from BOA, Urban's employees were indistinguishable from BOA's own employees.

63.    With the assistance of Urban, BOA's fraudulent scheme subjected the applicant Plaintiffs and other homeowners to a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to purposefully stall or otherwise hinder the modification application process, as a matter of policy, approved by the CEOs of both the BOA and Urban Defendants, and carried out with the assistance of Urban, using Plaintiffs and other homeowners as unwitting pawns during futile attempts at modification.

64.    BOA, BAC, and Urban employees liberally used the aforementioned practice of "Parking" to intentionally delay modification reviews, borrower inquiries, and data input of documents submitted by borrowers by simply assigning those status requests, reviews of files, and assignment of tasks or functions to vacationing or terminated employees, so as to allow those borrower requests to be purposefully delayed, expire, or go unanswered.

65.    When "Parking" borrower requests, reviews, documents, and file or task assignments, customer service representatives of the BOA, BAC, and Urban would use fictitious names, employee ID numbers, and telephone extensions when identifying themselves to borrowers, and falsify internal records, so as to allow their respective firms to later deny that those borrower communications had ever taken place to borrowers and government regulators.

### V.    PLAINTIFFS' FACTS & ALLEGATIONS

66.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

67.     Plaintiff, Laurie Kelly is a citizen of the State of Massachusetts residing at 41 Saint Margarets Street, Bourne, MA 02532, which is one of the subject properties referred to herein.

68.     Plaintiff, Mildred D'Italia is a citizen of the State of Massachusetts residing at 41 Saint Margarets Street, Bourne, MA 02532, which is one of the subject properties referred to herein.

69.     On or about November 15, 2002 a Deed was recorded in the Barnstable County Registry of Deeds in Book 15921, Page 180 granting the Property to Plaintiffs.

70.     On November 21, 2003, Plaintiffs executed a Mortgage which identified American Mortgage Network as Lender. The Mortgage Deed was recorded in the Barnstable County Registry of Deeds in Book 17982, Page 103, on December 1, 2003.

71.     Upon information and belief sometime on or about February, 2004, Plaintiffs mortgage and note were purchased by a FNMA created Trust. At that point in time, that as yet identified Trust became the true owner of the Plaintiffs' mortgage and note, and FNMA became the Trustee of said Trust, and who is commonly referred to as the "investor of Plaintiffs mortgage loan.

72.     Through a series of mortgage servicing assignments and transfers, Plaintiffs' mortgage came to be serviced by Countrywide Home Loans and through the purchase of Countrywide in July 2008, by Bank of America, N.A., through its subsidiary, BAC Home Loans Servicing, LP as successor in interest to Countrywide.

73.     In December 2008, Plaintiffs suffered a hardship and realized said hardship would cause their future imminent default of their mortgage obligation, however, Plaintiffs were not yet in default in December 2008.

74.     On or about December, 2008, Plaintiff Laurie Kelly contacted BAC Home Loans Servicing, LP to request modification consideration and was informed by a customer service representative that Plaintiffs could not be considered for a modification unless they were in default at least three months, on their monthly mortgage payment obligation.

75.     Plaintiffs allege BAC's customer service representative falsely stated that Plaintiffs would not be able to be considered for a modification unless and until they were three months in default, and that BAC and their customer service representative knew of the falsity of that statement. Said statement was false in that FNMA, (the "investor" of their mortgage loan) only requires that borrowers be in imminent default to be eligible for modification.

76.     Plaintiffs further allege that this material fact to the transaction at hand was willfully concealed from them by BAC and their customer service representative.

77.     Plaintiffs further allege that statement was knowingly false and misleading as it was BAC's sole intention gain Plaintiffs reliance on said false statement in order to have Plaintiffs purposefully default on their mortgage loan obligation, then encourage them to apply for modification assistance and to continually to keep Plaintiffs' request for modification in abeyance, in order to benefit from the servicing of their mortgage loan, for as long a time as possible, having absolutely no intention whatsoever to modify Plaintiffs' mortgage loan, seeking instead to foreclose at a later point in time in order to profit by said foreclosure as aforementioned and referenced herein.

78.     Plaintiff relied, accepted, and acted on that false statement and defaulted on their mortgage loan obligation in January, February, and March of 2009, so as to be eligible for a modification.

79.     On or about April 2009, Plaintiffs made an application to Servicer Defendant BAC Home Loans Servicing, LP for modification consideration that included personal financial information, tax information, and a statement attesting to their hardship.

80.     On or about May 2009, Plaintiffs received a FedEx package from BAC requesting that they fill out the enclosed application for modification, which was identical to the one Plaintiffs' had previously sent to BAC in April 2009, and return the documents, including personal financial information, tax information, and a statement attesting to Plaintiffs' hardship.

81.     Plaintiffs complied with this request and did return all documents to BAC, as requested, including personal financial information, tax information, and a statement attesting to Plaintiff's hardship, on or about May 2009.

82.     Plaintiffs allege that this was the beginning of a repetitive series of duplicative documentation requests for documents already provided by Plaintiff to BAC as part of a fraudulent scheme to purposefully keep their request for modification in a perpetual state of abeyance.

83.     Plaintiffs allege that each time they complied with said documentation requests, and returned their documents via prepaid return FedEx envelope, provided by BAC to Plaintiffs, the documents were delivered to Urban Lending Solutions "390 Group" location at 390 InterLocken Crescent, Broomfield, CO 80021.

84.     Plaintiffs further allege that when their documents were received at Urban's "390 Group" location, they were scanned into Urban's BOA Document Portal, which was used by Urban, at the direction of BOA, to conceal Plaintiffs' and hundreds of thousands of other borrowers modification request documents, from BOA, BAC, and Urban customer service representatives, in order to allow them to falsely deny that BOA and/or BAC had in fact received those documents as aforementioned.

85.     Plaintiffs further allege, that by operating the BOA Document Portal as aforementioned, it was BOA's intent to fraudulently profit from the servicing of Plaintiffs and others mortgage loans, by purposefully hindering modification requests, keeping them in a pending status for as long a time as possible, so as to benefit directly from servicing those mortgage loans fraudulently kept in modification abeyance.

86.     In furtherance of BOA's fraudulent scheme, BAC, by and through corporate direction from BOA CEO Brian Moynihan and Senior Executives Kenneth Scheller and Barbara Desoer, and with the assistance of Urban and its executives Charles Saunders and Jim Smith, BAC continued this pattern of fraudulent, repetitive, and duplicative requests for documents already provided to BAC by Plaintiffs, from May 2009 through June 2010.

87.     On June 30, 2010, Orlans Moran, PLLC acting as attorney for BAC Home Loans Servicing, LP. Sod Plaintiffs' subject property at foreclosure auction. BAV acting as nominee for FNMA purchased the property and assigned their bid to FNMA.

88.     On or about July 2, 2010, Plaintiffs received, via mail, approval of their modification request from BAC, at their subject property address.

89.     Plaintiffs allege that their foreclosure was the direct result of their reliance on the false statements and misrepresentations of, and the willful concealment of material facts by, BOA, BAC, and Urban, as referenced herein, and that such reliance was justified.

90.     Plaintiffs allege that the foreclosure of their mortgage loan and auction of their subject property were conducted by BAC, in furtherance and part of the fraudulent scheme as aforementioned and referenced herein, so as to profit.

91.     Plaintiffs further allege that their Note was not in default at the time of said foreclosure auction.

92.     Plaintiffs are defendants in an allegedly wrongful eviction action filed against them by FNMA, subsequent to an alleged wrongful foreclosure.

93.     Plaintiffs allege that BAC fraudulently misled Plaintiffs with false statements, deceit, and concealment of information, and hindered their legitimate request for modification assistance, so as to maximize servicing income and unnecessary recoverable servicing expenses by keeping their modification request in willful, purposeful abeyance.

94.     Plaintiffs allege that those false statements, deceit, and willful concealment of facts material to the transaction at hand, which BAC and their customer service representatives as referenced herein, had a duty to disclose, were made with knowledge of their falsity, and with the intent to purposefully mislead Plaintiffs into relying on those statements and willful concealments.

95.     Plaintiffs allege that their reliance was justifiable as BAC was the servicer of their mortgage loan and Plaintiffs relied that as such, BAC and their customer service representatives would only be dealing with them fairly and in good faith, and it is reasonable

for Plaintiffs to have relied same. Plaintiffs further allege that any other person of similar intelligence, education, and experience would have relied same on the aforementioned alleged false statements.

96.     Plaintiffs justifiably relied on the alleged false statements made to them by the various BAC customer service representatives, noted above, during the time they requested modification assistance.

97.     Plaintiffs further allege that as part of the Defendants' fraudulent scheme aforementioned, the BOA, BAC and/or Urban customer service representatives they spoke with used fictitious names when identifying themselves to them so as to conceal their true identity in order to deny culpability for false statements that had been made to Plaintiffs, and did routinely falsify internal records so as to conceal facts surrounding communications with Plaintiffs, so as to further conceal those false statements, misrepresentations, and deceit from government regulators.

98.     Plaintiffs allege that BOA's CEO, Brian Moynihan and senior executives Ken Scheller, and Barbara Desoer and Urban senior executives Charles Saunders and Jim Smith, knew of the falsity of the statements being made to them by BOA, BAC and/or Urban customer service representatives, by having concealed documentation and other relevant information regarding their modification requests, sent by Plaintiffs to Urban's "390 Group" location, from those customer service representatives, thus allowing them to make said false statements .

99.     Plaintiffs further allege that it was the intent of BAC, by and through corporate direction from BOA CEO Brian Moynihan and Senior Executives Kenneth Scheller and Barbara Desoer, and with the assistance of Urban and its executives Charles Saunders and Jim Smith and through BAC & Urban's respective customer service representatives and employees, to falsely deny receiving documents from Plaintiffs, falsely state that Plaintiffs would be need to default on their mortgage loan obligations in order to be eligible for modification consideration, and to willfully and purposefully deceive Plaintiffs regarding their

willingness to provide Plaintiffs a modification at all, in order to keep Plaintiff's and others modification requests in abeyance, as part of a fraudulent scheme to profit from the servicing of  mortgage loans as noted herein.

100.      Plaintiffs allege that rather than timely informing them of their unwillingness to modify Plaintiffs' mortgage loan, BAC, through their customer service representatives, and with the assistance of Urban, and by the execution of the fraudulent scheme as noted herein, repeatedly allowed Plaintiffs to unnecessarily and pointlessly apply for modification, then purposefully hindered their modification request using the various methods noted herein, keeping their request in abeyance, so as to profit from said hindrance, as aforementioned and noted herein, thereby causing Plaintiffs significant, unnecessary, prolonged emotional and mental distress.

101.      Plaintiffs accepted and acted on those false statements, by repeatedly applying for modification of their mortgage loan, and relying on false statements that they would need to be three months defaulted on their mortgage loan obligations to be eligible for modification consideration, and such reliance was reasonable. Plaintiffs relied on those false and misleading statements and such reliance was to Plaintiffs' detriment as aforementioned.

102.      Plaintiffs allege that Defendant BOA, BAC, and Urban's conduct was fraudulent, and they breached their duties of good faith and fair dealing, as noted herein.

103.      Plaintiffs allege that the business practices as aforementioned were part of BOA, BAC, and Urban's fraudulent scheme as noted herein, and reasonably likely to deceive them.

104.      Plaintiffs allege that the gravity of harm they suffered as the result of BOA, BAC, and Urban's fraudulent business practices far outweighs BOA, BAC, and Urban's reasons, justifications, and motives, as noted herein.

105.      BOA, BAC, and Urban's deception, willful concealment, and false and misleading statements directly caused Plaintiffs which was reasonably foreseeable.

106.      As the direct result of BOA, BAC, and Urban's fraudulent scheme, willful concealment of facts material to the transaction at hand, unfair acts, and false statements,

Plaintiffs suffered general damages such as loss of property interest, negative impact to credit ratings, loss of home, and extreme mental and emotional distress.

107.     As the direct result of BOA, BAC, and Urban's fraudulent scheme, willful concealment of facts material to the transaction at hand, unfair acts,  and false statements, Plaintiffs suffered quantifiable damages such as loss of equity in home, legal costs associated with defense of foreclosure, eviction and bankruptcy.

108.     As the direct result of BOA, BAC, and Urban's fraudulent scheme, willful concealment of facts material to the transaction at hand, unfair acts and false statements, Plaintiffs suffered quantifiable damages, such as the improper assessment of unnecessary servicing related fees and costs, loss of money that could have been used to fund relocation costs, etc.

109.     BOA, BAC, and Urban's conduct as described in this complaint was willful or knowing.

110.    Plaintiffs' state that they were at all times truthful in their statements to BAC, and provided them with true and accurate information when asked to do so, at all times relevant to the allegations as stated herein.

## VI.     CAUSE OF ACTION

### COUNT I
#### Fraud

111.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

112.     Defendants' made false statements and misrepresentations to Plaintiffs, and willfully concealed facts material to the transaction at hand from Plaintiffs, which Defendants and their customer service representatives as referenced herein, had a duty to disclose, and those false statements, misrepresentations, and willfully concealed facts were made with knowledge of their falsity, and with the intent to purposefully mislead Plaintiffs into relying on those statements and willful concealments.

113.     The Defendants fraudulently misled Plaintiffs with knowingly false statements, misrepresentations, and willful, knowing concealment of material facts to the transactions at hand that the Defendants had a duty to disclose, with the intention that those false statements, misrepresentations, and willful concealment would instead hinder Plaintiffs' legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by fraudulently and purposefully keeping those modification requests in abeyance, then foreclosing Plaintiffs mortgage loan as part of Defendants fraudulent scheme to further profit from the recovery of unnecessary servicing related advances and improper fees  and costs assessed to Plaintiffs mortgage loan account related to default, foreclosure, REO management, and eviction.

114.     Defendants fraudulently misled Plaintiffs with false statements, deceit, and concealment of information, and hindered legitimate requests for modification assistance, with the intent to maximize servicing income and unnecessary recoverable servicing expenses by keeping modification requests in willful, purposeful abeyance.

115.     Plaintiffs relied on the Defendants' false statements, misrepresentations, and willful concealment of material facts.

116.     Such reliance by Plaintiffs was justifiable as Defendants were/are the servicers of Plaintiffs' mortgage loan and Plaintiffs relied that as such, the Defendants and their customer service representatives would only be dealing with Plaintiffs fairly and in good faith, and it is reasonable for Plaintiffs to have relied same as any other person of similar intelligence, education, and experience would have relied same.

117.     Plaintiffs justifiably relied on the alleged false statements made by the various Defendants' customer service representatives, noted above, during the time Plaintiffs requested modification assistance.

118.     Plaintiffs relied, accepted and acted on those false statements, misrepresentations, and willful concealment of material facts as aforementioned and referenced herein, and such reliance was reasonable and to Plaintiffs detriment as noted herein.

119.     The Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business.

120.     The Defendants' conduct violated existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare.

121.     Plaintiffs are unsophisticated customers and could not have discovered the true nature of the material facts on their own.

122.     Plaintiffs were ignorant of the facts, which the Defendants failed to disclose, and their reliance on the Defendants false statement, misrepresentations, and willful concealment of facts was a substantial factor in causing them harm.

123.     As a proximate result of the facts the Defendants failed to disclose, and Plaintiffs' reliance therein, Plaintiffs and others have suffered damages in an amount to be determined at trail.

124.     The conduct of the Defendants as mentioned above was fraudulent, and by virtue thereof Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish and make an example of the Defendants.

125.     Plaintiffs are entitled to an injunction requiring that the Defendants take all necessary steps to properly review their modification requests for consideration.

126.     Plaintiffs are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiffs and others, or any eviction action until such time as proper reviews of their requests for modification consideration are complete.

127.     The Plaintiffs are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

128.     Plaintiffs have suffered harm and are threatened with additional harm from the Defendants fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

129.     The Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

130.     The Defendants' conduct as set forth herein is not required, permitted or authorized by any state or federal law.

131.     The Defendants' conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

132.     The Defendants' deception, willful concealment, and false and misleading statements directly caused Plaintiffs harm which was reasonably foreseeable.

133.     As the direct result of the Defendants' fraudulent scheme, willful concealment of facts material to the transaction at hand, and false statements as referenced herein, Plaintiffs suffered general damages such as loss of property interest, negative impact to credit ratings, loss of home, and extreme mental and emotional distress.

134.     As the direct result of the Defendants' fraudulent scheme, willful concealment of facts material to the transaction at hand, and false statements and misrepresentations, Plaintiffs suffered quantifiable damages such as assessment of improper and unnecessary costs and fees associated with default, foreclosure, and eviction, loss of equity in homes, money spent on moving and relocation expenses, legal costs associated with defense of foreclosure, eviction and bankruptcy.

135.     Plaintiffs are entitled to punitive damages.

136.     Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Enter a judgment declaring the acts and practices of Defendants complained of

herein do constitute a fraud and a breach of duty of good faith and reasonable

diligence, together with an award of monetary damages and other available relief

on those claims;

c.      Grant a permanent or final injunction enjoining Defendants agents and

employees, affiliates and subsidiaries, from continuing to harm Plaintiffs;

d.      Order specific performance of Defendants obligations together with other relief

required by law;

f.      Award actual, exemplary and/or statutory minimum damages;

g.      Award restitution and prejudgment interest;

h.      Award punitive damages;

i.      Award Plaintiffs the costs of this action, including the fees and costs of experts,

together with reasonable attorneys' fees;

j.      Grant Plaintiffs such other and further relief as this Court finds necessary and

proper.

Dated: December 13, 2012

Respectfully Submitted,


_/s/ Todd S. Dion_                             
Todd S. Dion, Esq. (*BBO* # 659109)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-942-9924
Facsimile:  401-942-9925
toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2012, a copy of the foregoing document shall be served by first class mail postage prepaid on the parties.

_/s/ Todd S. Dion_____
Todd S. Dion, Esq.